UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| KAREN MCGRATH, ET AL | CIVIL ACTION |
| VERSUS | NO: 06-11413<br>Ref. 08-1475<br>08-4044 |
| CHESAPEAKE BAY DIVING, ET AL | SECTION: "J" (1) |

**ORDER AND REASONS**

Before the Court is defendants Global Enterprises, LLC, formerly Global Explorer, LLC (collectively "Global") and Maritime Management Services, Inc.'s **Motion for Partial Summary Judgment (Rec. Doc. 133)**. This motion is opposed. Upon review of the record, the memoranda of counsel, and the applicable law, this Court now finds, for the reasons set forth below, that the motion should be denied.

**Background Facts**

This case stems from an accident during a salvage operation in the Gulf of Mexico on or about August 29, 2006. The goal of the salvage operation was to recover several platforms owned by the Rowan Companies, Inc. ("Rowan") that had been toppled during

Hurricanes Katrina and Rita. During the operation, diver Chandon McGrath sustained fatal injuries. Divers Brian Bradford and Jason Pope were injured while attempting to rescue McGrath. McGrath's parents filed suit in this Court on December 29, 2006. Pope filed suit in this Court on January 16, 2007. Bradford filed suit in this Court on April 1, 2008 and in the District of South Carolina on September 22, 2006. The South Carolina case was transferred to this district and all of the Pope and Bradford cases were consolidated with the McGrath case. The McGrath and Pope cases have subsequently settled.

In undertaking the salvage operation, Rowan contracted with several other entities. The main salvage contractor was Bisso Marine, LLC ("Bisso") who entered into a contract with Rowan. Global Mem., Rec. D. 133. Bisso provided some of its own divers for the operation and contracted with Chesapeake Bay Diving, Inc. ("Chesapeake") and 2-W Diving, Inc. ("2-W") to provide additional divers. Id. Bradford was employed by 2-W. Rowan also entered into a Master Service Agreement ("MSA") with International Subsea, Inc. ("Subsea"). Id. Global and Subsea dispute the purpose and requirements of this MSA. Subsea in turn chartered a vessel from Global, the M/V GLOBAL EXPLORER, pursuant to a Master Time Charter (the "Charter"). Id. The Charter provided that Maritime Management Services, Inc. ("Maritime Management") would be the Operator of the vessel. Id.

All of the entities discussed above who were involved in the salvage operation are defendants in this consolidated action. By Order of this Court on July 1, 2008 it was deemed that each defendant in the Bradford litigation had filed a cross claim against every other defendant for contribution and/or indemnity and that each defendant had answered denying these claims. Rec. D. 108. Global has filed the present Motion for Partial Summary Judgment on its cross claims against Subsea to force Subsea to defend and indemnify Global against all claims asserted by Bradford.

## The Parties' Arguments

Global has filed this motion arguing that under the Charter, Subsea is contractually obligated to defend and indemnify Global against the Bradford claims. Global argues that the BIMCO Uniform Time Charter Party for Offshore Vessels, named "SUPPLYTIME 89" was incorporated in the Charter. Clause 17(a) of that agreement authorizes Subsea to sublet, assign, or loan the M/V GLOBAL EXPORER to another entity with Global's approval. If such a sublease, assignment, or loan occurs then Clause 17(a) provides that contractors of the entity subletting the vessel are deemed contractors of Subsea for all purposes of the Charter. Global further argues that Clause 12(b) of the SUPPLYTIME 89 provides that Global is not responsible for personal injury

3

damage claims made against it by Subsea's employees, contractors, or subcontractors and that Subsea is required to defend and indemnify Global against such claims even if the injury was caused by Global or the unseaworthiness of the M/V GLOBAL EXPLORER. Global contends that Subsea chartered the vessel to provide it to Rowan pursuant to the MSA between Subsea and Rowan. As a result, Global asserts that Clause 17(a) is activated and Rowan's contractors and subcontractors (i.e. Bisso, Chesapeake, and 2-W) are deemed contractors and subcontractors of Subsea. Bradford was the employees of one of these subcontractors. Thus, pursuant to Clause 12(b) Subsea must defend and indemnify Global from these claims. Additionally, Global argues that Clause 12(e)(ii) of the SUPPLYTIME 89 provides that the requirement to defend and indemnify extends to Maritime Management as the Operator of the vessel.

Subsea has opposed the motion. Subsea objects to several conclusory statements in the Global motion that they contend are an inaccurate recitation of the facts or a mischaracterization of the Charter and MSA. Subsea argues that they did not in fact subcontract with Chesapeake or 2-W and thus Clause 12(b) of the SUPPLYTIME 89 does not require them to defend and indemnify. Furthermore, Subsea argues that they never sublet, assigned, or loaned the vessel to Rowan and that the MSA between Subsea and Rowan did not call for such a transfer in rights to the vessel,

4

so as a matter of law the MSA cannot be interpreted to be a sublease, assignment, or loan of the vessel. As a result, Subsea contends that Clause 17(a) of the SUPPLYTIME 89 does not operate to deem Bisso, Chesapeake, or 2-W a contractor or subcontractor of Subsea. Additionally, the language of Clause 17(a) only references contractors of the assignee being deemed contractors of Subsea. Chesapeake and 2-W were subcontractors and thus Subsea argues that even if it sublet, assigned, or loaned the vessel to Rowan they would not have to defend and indemnify for injuries to employees of Rowan's subcontractor because those subcontractors would not be deemed subcontractors of Subsea. Lastly, Subsea argues that at the very least there are genuine issues of material fact regarding whether the MSA constitutes a sublease, assignment, or loan of the vessel. While a letter attached to the MSA discusses the terms for use of two specific vessels, there is no discussion of terms for the use of the M/V GLOBAL EXPLORER. Subsea suggests that there is an addendum to the MSA discussing these terms, but that those terms are not known at this time which prevents summary judgment. Subsea also argues that while Clause 17(a) of the SUPPLYTIME 89 requires that Global approve any sublease, assignment, or loan of the vessel, there is no evidence that such approval was ever given, further calling into doubt whether there ever was a sublease, assignment, or loan.

Global submitted a reply memorandum arguing that Subsea did in fact sublease, assign, or loan the vessel.  Global contends that based on the MSA Subsea subleased the vessel to Rowan for the purposes of diving and salvage support.  Global also contends that based on the MSA Subsea assigned the vessel and loaned the vessel to Rowan.  Global's arguments focus on the Special Provisions contained in a letter addendum dated January 25, 2006 which modified the MSA.  Global asserts that the Special Provisions create an obligation for Subsea to provide Rowan with a vessel and that this obligation is the reason that Subsea chartered the M/V GLOBAL EXPLORER.  Although the Special Provisions that Global references do not pertain to the M/V GLOBAL EXPLORER and instead discuss the use of two different vessels and state that if a different vessel is to be used the terms of the Special Provisions are to be renegotiated, Global maintains that the fact that the renegotiated terms for the M/V GLOBAL EXPRESS have not been identified by any party is not material.  Global also argues in its reply memorandum that the Charter between Global and Subsea provides explicit approval for the sublease, assignment, or loan of the vessel to Rowan because the Charter identifies the same purpose for the use of the vessel as does the MSA.  Additionally, the burden was on Subsea to notify Global of any sublease, assignment, or loan, and if this did not happen then Subsea cannot base their argument on a lack

6

of approval from Global.  Global further argues that although Clause 17(a) only references contractors, it was within the contemplation of the parties that Subsea would be responsible for all diving activities in which the vessel was used, including those of contractors and subcontractors.

Subsea provided a surreply memorandum to further press its arguments.  Subsea contends that the MSA clearly states that Subsea is to provide services, not a vessel, to Rowan.  The MSA explicitly states as much in the "Use of Vessels" section.  The MSA provides that Subsea is to utilize a vessel to provide services and that Subsea is an independent contractor that has control of its work.  There is no language in the MSA that suggests a sublease, assignment, or loan of the vessel.  Furthermore, Global cannot cite to any contractual terms of the MSA that pertain to the M/V GLOBAL EXPLORER.  The M/V GLOBAL EXPLORER was a substitute vessel and the MSA did no more than contemplate the use of a substitute vessel.  The terms for the use of a substitute vessel were specifically to be renegotiated, however Global has not identified the renegotiated terms that applied to the M/V GLOBAL EXPLORER.  Additionally, Subsea argues that the Charter could not have explicitly approved of a sublease, assignment, or loan simply by including the same work description as the MSA because there is no evidence that the MSA identified by Global even applies to the M/V GLOBAL EXPLORER

because it was a substitute vessel with the terms to be renegotiated. Any lack of evidence regarding notice of a sublease, assignment, or loan begs the question as to whether such a sublease, assignment, or loan ever happened. Subsea asserts that the evidence that is necessary here is evidence of Global's approval of such a sublease, assignment, or loan, not simply evidence that Global was given notice of such an action. Subsea reasserts its argument that since there was no sublease, assignment, or loan, none of Rowan's contractors may be deemed contractors of Subsea. Additionally, even if there was a sublease, assignment, or loan the plain language of Clause 17(a) does not include subcontractors and prevents deeming certain parties to be subcontractors.

Subsequently, Global submitted an amended memorandum in support of the motion that clarified certain factual issues. Subsea also submitted an amended opposition memorandum. The substantive arguments made by the parties in the amended memoranda are the same as those made in the original memoranda discussed above.

## **Discussion**

Summary judgment is appropriate if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving

8

party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986).

The requirement that Subsea defend and indemnify Global, if such a requirement exists, would be a contractual requirement of the Charter. As a preliminary step, it must be determined whether the Charter is a maritime contract governed by federal law. The Supreme Court has noted that the key determination is "the nature of the contract, as to whether it has reference to maritime service or transactions." Kossick v. United Fruit Co., 365 U.S. 731, 735 (1961). The Fifth Circuit has further clarified that "[a] principal determinant is the relation the contract 'bears to the ship . . . . A contract relating to a ship in its use as such, or to commerce . . . is subject to maritime law." Theriot v. Bay Drilling Corp., 783 F.2d 527, 538 (5th Cir. 1986)(quoting 1 BENEDICT ON ADMIRALTY § 183 (7th ed. 1985)). The parties to this motion do not dispute, and there can be little doubt, that the Charter is a maritime contract and thus is governed by federal law.

Under federal maritime law, indemnity clauses in maritime

contracts are generally enforceable, even for a party's own negligence, as long as the indemnity provision is clear, express, and unambiguous. See <u>Corbitt v. Diamon M. Drilling Co.</u>, 654 F.2d 329, 33 (5th Cir. 1981); <u>Foreman v. Exxon Corp.</u>, 770 F.2d 490, 498 (5th Cir. 1985). "A maritime contract containing an indemnity agreement . . . should be read as a whole and its words given their plain meaning unless the provision is ambiguous." <u>Weathersby v. Conoco Oil Co.</u>, 752 F.2d 953, 955 (5th Cir. 1984). Courts "should construe [an] indemnity clause to cover all losses 'which reasonably appear to have been within [the parties'] contemplation.'" <u>Kemp v. Gulf Oil Corp.</u>, 745 F.2d 921, 924 (5th Cir. 1984)(quoting <u>Corbitt</u>, 654 F.2d at 333). An indemnity provision "should not be read to impose liability for those losses or liabilities which are neither expressly within its terms nor of such a character that it can be reasonably inferred that the parties intended to include them within the indemnity coverage." <u>Corbitt</u>, 654 F.2d at 333. "Interpretation of the terms of a contract is a matter of law." <u>Weathersby</u>, 752 F.2d at 956.

The indemnity provision at issue in these motions is Clause 12(b) of the SUPPLYTIME 89 contained in the Charter. It provides:

> Notwithstanding anything else contained in this Charter Party excepting Clause 21, the Owners shall not be

> responsible for . . . any liability arising out of . . . personal injury or death of the employees of the Charterers or of their contractors and subcontractors (other than the Owners and their contractors and subcontractors) . . . arising out of or in any way connected with the performance of this Charter Party, even if such . . . injury or death is caused wholly or partially by the act, neglect or default of the Owners, their employees, contractors or subcontractors, and even if such . . . injury or death is caused wholly or partially by the unseaworthiness of any vessel, and the Charterers shall indemnify, protect, defend and hold harmless the Owners from any and against all claims, costs, expenses, actions, proceedings, sits, demands and liabilities whatsoever arising out of or in connection with such loss, damage, liability, personal injury or death.

The plain language of this clause indicates that if Bradford was the employee of a contractor or subcontractor of Subsea, then Subsea would be contractually required to defend and indemnify Global for the claims. However, Bradford was not in fact an employee of Subsea's contractors or subcontractors. Subsea had no contractual relationship with Bisso, Chesapeake, or 2-W. Instead, Bisso was a contractor of Rowan and Chesapeake and 2-W

11

were subcontractors of Rowan.  As a result, Subsea would only have to defend and indemnify Global against the Bradford claims if 2-W was deemed to be a contractor or subcontractor of Subsea pursuant to Clause 17(a) of the SUPPLYTIME 89.

Clause 17(a) of the SUPPLYTIME 89 provides:

> The Charterers shall have the option of subletting, assigning or loaning the Vessel to any person or company not competing with the Owners, subject to the Owner's prior approval which shall not be unreasonably withheld, upon giving notice in writing to the Owners, but the original Charterers shall always remain responsible to the Owners for due performance of the Charter Party and contractors of the person or company taking such subletting, assigning or loan shall be deemed contractors of the Charterers for all purposes of the Charter Party.

This provision read together with Clause 12(b) provides that if Subsea, as the Charterer, subleases, assigns, or loans the vessel to another company, then the contractors of that other company are deemed to be contractors of Subsea, and pursuant to Clause 12(b) Subsea would have to defend and indemnify Global for claims by that contractor's employees.

Global argues that the MSA between Subsea and Rowan required Subsea to provide a vessel to Rowan and that as a result of the MSA Subsea sublet, assigned, or loaned the M/V GLOBAL EXPLORER to

Rowan, thus activating Clause 17(a). However, Global does not point to any evidence that the MSA required Subsea to sublease, assign, or loan a vessel. Instead, Global continuously asserts that because Subsea "provided" a vessel for the salvage operation Clause 17(a) is activated.

It is not at all clear that the MSA provides for the subleasing, assignment, or loan of a vessel from Subsea to Rowan. Instead, the MSA preamble states that it is a contract for "goods and/or services." Ex. A to Global's Mem., Rec. D. 133. The MSA does contain a section that discusses the use of vessels by Subsea. Paragraph 12 of the MSA is entitled "Use of Vessels." The paragraph provides:

> Contractor may, with prior approval of Rowan perform services hereunder using vessel(s) owned and/or operated by others; provided, however, that Contractor will remain liable to fulfill all duties, obligations and responsibilities under this Agreement as if Contractor were the owner and operator of such vessel(s). . . . Nothing contained herein shall be construed as making the actual owners and/or operators of such vessels third party beneficiaries of this Agreement, and nothing contained herein shall be construed as affecting such actual owner's and/or operator's liability to Rowan.

Paragraph 12 further states in subsection (c) that:

> In the event any vessel(s) owned, operated or chartered by Contractor should be constructively or actually lost and Contractor files exoneration or limitation of liability proceedings in connection with such loss, it is expressly understood and agreed that this Agreement is a personal contract and none of the terms and conditions of this Agreement shall be affected by such proceedings and that the contractual rights and obligations of the parties hereto shall be and remain the same as though such proceedings had never been filed.

These provisions of the MSA make clear that it is a personal contract for Subsea's services and that Rowan took no interest in or control of any vessel chartered by Subsea. Additionally, the MSA includes a letter addendum containing the Special Provisions in which Rowan discusses the potential use of two vessels by Subsea, neither of which are the M/V GLOBAL EXPLORER. Id. The letter also states that terms of a substitute vessel would have to be renegotiated. Id. Thus, even if the MSA could serve as an agreement to sublease, assign, or loan the M/V GLOBAL EXPLORER, which it does not seem to do, there would be an issue of material fact as to whether a sublease, assignment, or loan was negotiated specifically with regard to the M/V GLOBAL EXPLORER.

Additionally, Clause 17(a) of the SUPPLYTIME 89 requires that Global approve any sublease, assignment, or loan of the

vessel.  There is no evidence before the Court that any such approval was given.  Global argues that their approval is explicit in the Charter because the M/V GLOBAL EXPLORER was chartered for the purpose of Subsea fulfilling its obligations under the MSA.  However, as discussed above, the MSA does not provide for a vessel to be sublet, assigned, or loaned to Rowan.  Further, the letter addendum to the MSA discusses two vessels neither of which is the M/V GLOBAL EXPLORER, and explicitly states that terms would have to be renegotiated if a different vessel was used by Subsea.  Thus, even if the Charter could serve as an explicit approval based on the MSA, the MSA's provisions specifically with regard to the M/V GLOBAL EXPLORER are still not clear.  Since the provisions of Clause 17(a) are not triggered unless this approval is provided by Global, the lack of any evidence of such approval creates an issue of material fact that would prevent summary judgment.

Finally, Subsea has also argued that the plain language of Clause 17(a) prevents indemnity where the claims at issue have been brought by an employee of Rowan's subcontractor.  Clause 17(a) provides that when the vessel is sublet, assigned, or loaned the "contractors of the person or company taking such subletting, assigning or loan shall be deemed contractors of the Charterers for all purposes of the Charter Party."  As a result of this clause deeming the contractors of Rowan, the company

15

taking the sublease, assignment, or loan, as the contractors of Subsea, Subsea would have to indemnify Global, pursuant to Clause 12(b), for the claims of any of Rowan's contractors or their employees. However, the claims at issue in this case were brought by Bradford, an employee of Rowan's subcontractor 2-W. Clause 17(a) does not explicitly provide for deeming a subcontractor of Rowan to be a subcontractor of Subsea. Global contends that despite the language referencing only contractors, the Court should conclude that it was within the reasonable contemplation of the parties that the claims of both contractors and subcontractors would be indemnified if there was a sublease, assignment, or loan. See Corbitt, 654 F.2d at 333. However, Subsea maintains that Clause 17(a) is unambiguous and includes only contractors, and because there is no ambiguity the plain language should be followed . See Weathersby, 752 F.2d at 955. Furthermore, Subsea argues that the Court can only conclude that the inclusion of the term subcontractors in Clause 12(b) and the lack of inclusion of subcontractors in the "deeming" provision of Clause 17(a) was purposeful. Although there are issues of material fact that preclude summary judgment, the language of Clause 17(a) also appears to prevent Subsea from having to indemnify Global. Accordingly,

**IT IS ORDERED** that defendants Global Enterprises, LLC, formerly Global Explorer, LLC and Maritime Management Services,

16

Inc.'s **Motion for Partial Summary Judgment (Rec. Doc. 133)** is hereby **DENIED.**

New Orleans, Louisiana, this 21st day of May, 2008.

_____
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE